IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUNDEXCHANGE, INC.<br>733 10th Street NW<br>10th Floor<br>Washington, D.C. 20001<br><br>    Plaintiff,<br><br>v.<br><br>MUZAK LLC<br>3318 Lakemont Boulevard<br>Fort Mill, SC 29708<br><br>    Defendant. | Civil Action No. ___<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**PRELIMINARY STATEMENT**

  1. Defendant Muzak, LLC ("Muzak") is the provider of one of the earliest digital music offerings in the United States – the "DishCD" offering provided to consumers as part of Dish satellite television packages. As such, Muzak was one of the first users of the Copyright Act's "statutory license" to make digital transmissions of sound recordings. When Congress significantly revised that statutory license in 1998, it granted Muzak the special privilege of using copyrighted sound recordings at "preexisting subscription service" royalty rates that had been set below fair market value. Congress made clear, however, that Muzak could pay such rates only for its provision of music channels to consumers as part of the Dish service.

  2. As of May 1, 2014, Muzak expanded the scope of its consumer business to include the provision of music offerings other than the Dish channels, including offerings provided through DirecTV and other entities classified in 47 U.S.C. § 522(13) as "multichannel video programming distributor[s]" ("MVPDs"). Muzak has, by its own admission, made payments for these additional offerings based on the below-market "preexisting subscription

1

service" rates. But those rates are applicable only to the Muzak channels provided through Dish. Muzak's offerings other than the Dish channels are subject to the rates for "new subscription service[s]" as defined in 17 U.S.C. § 114(j)(8), not the lower rates for "preexisting subscription service[s]."

3. Plaintiff SoundExchange, Inc. ("SoundExchange") is the sole entity designated by regulation in the United States to collect statutory license payments from copyright users and to distribute those payments to performing artists and copyright owners. Thus, it is SoundExchange to which Muzak is obligated to make payments under the statutory license. SoundExchange brings this action to recover the royalty amounts that Muzak has underpaid by inappropriately attempting to pay for its non-Dish music offerings at the "preexisting subscription service" rates.

**JURISDICTION AND VENUE**

4. This is a civil action seeking damages under the Copyright Act, 17 U.S.C. § 101, *et seq*.

5. This Court has original subject matter jurisdiction over Copyright Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). A substantial part of the events giving rise to this suit have occurred in this District, and Muzak's contacts with the District of Columbia are sufficient to subject it to jurisdiction in this District.

7. Muzak is registered to do business in the District of Columbia; on information and belief, Muzak provides music channels to satellite television subscribers throughout the country, including in the District of Columbia; on information and belief, Muzak also provides business music services to customers throughout the country, including in the District of

Columbia; Muzak has elected to be bound by the statutory license by filing the required Notice of Use of Sound Recordings with the United States Copyright Office in the District of Columbia; Muzak sends statements of account and royalty payments to SoundExchange's District of Columbia office; and Muzak's correspondence with SoundExchange in advance of this litigation was both sent and received in the District of Columbia.

## PARTIES

8.  Plaintiff SoundExchange is an independent nonprofit organization organized and existing under the law of the State of Delaware, with its headquarters at 733 10th Street NW, 10th Floor, Washington, DC 20001. SoundExchange is the sole entity in the United States designated by the Copyright Royalty Judges to collect digital performance royalties from statutory license users and to distribute those royalties to performing artists and copyright owners. Specifically, SoundExchange is charged by statute and regulation with administering the statutory license, *see, e.g.*, 17 U.S.C. § 114(g)(3)(A); 37 C.F.R. § 370.3, .4, collecting and distributing statutory royalties, *see, e.g.*, 17 U.S.C. § 114(g)(2), (3); 37 C.F.R. § 382.4, 383.4, and enforcing the terms of the statutory license, *see, e.g.*, 17 U.S.C. § 114(g)(3)(C). Pursuant to this authority, SoundExchange collects statutory royalties from television music channels, satellite radio, Internet webcasters, and other types of services for transmission of sound recordings, and distributes those royalties to artists and record companies.

9.  Defendant Muzak is a corporation organized and existing under the law of the State of Delaware, with its principal place of business located at 3318 Lakemont Boulevard, Fort Mill, SC 29708. Muzak is a wholly-owned subsidiary of Mood Media Corporation, a Canadian corporation. Muzak provides music offerings currently branded as DishCD and Dish Music, which are included in Dish satellite television subscription packages. Muzak also provides other

consumer music offerings to MVPD subscribers, such as the SonicTap offering included in DirecTV satellite television subscription packages. In addition, Muzak streams music to businesses as a so-called "business establishment" service, in the manner envisioned by 17 U.S.C. § 114(d)(1)(C)(iv). Finally, Muzak operates a commercial webcasting service that streams music as part of the websites of various companies.

## FACTUAL ALLEGATIONS

**A.     The Statutory and Regulatory Framework**

10.     Section 106 of the Copyright Act grants the owner of a copyright in a sound recording the exclusive rights "to reproduce the copyrighted work in copies or phonorecords" and "to perform the copyrighted work publicly by means of a digital audio transmission." 17 U.S.C. §§ 106(6), (7).

11.     As an alternative to having every music service negotiate separate licenses with every copyright owner, Congress has granted various eligible entities the ability to obtain a "statutory license," 17 U.S.C. §§ 112(e), 114(d)(2), to render certain digital public performances of copyrighted sound recordings and make related reproductions. This license allows eligible entities that comply with applicable requirements, including the payment of established royalties, to reproduce and publicly perform all commercial sound recordings without fear of copyright infringement.

12.     "[R]easonable rates and terms of royalty payments" under the statutory license are set by the Copyright Royalty Judges in adversarial proceedings that occur every five years. *Id.* §§ 112(e)(3), 114(f). The "rates and terms" set in proceedings before the Copyright Royalty Judges "distinguish among the different types of digital audio transmission services then in operation." *Id.* § 114(f).

13. During the early days of digital music services, prior to October 1998, services making digital audio transmissions pursuant to the statutory license paid royalties under terms and rates first set by a Copyright Arbitration Royalty Panel, based on objectives set forth in 17 U.S.C. § 801(b)(1). The Copyright Arbitration Royalty Panel held that the "standard for setting the royalty rate for the performance of a sound recording by a digital audio subscription service [was] not fair market value," but "reasonable rates . . . determined based on policy considerations." 63 Fed. Reg. 25,394, 25,399 (May 8, 1998). Applying that standard, the Panel ultimately concluded that "the best way to achieve the four statutory objectives was to set a low rate favoring the Services." *Id*. at 25,406.

14. In October 1998, Congress passed the Digital Millennium Copyright Act ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (Oct. 28, 1998), which amended section 114 and other provisions of the Copyright Act. Among other things, the DMCA put in place a new royalty rate standard for the sound recording statutory license. Pursuant to the new standard, royalty rates and terms for services making digital audio transmissions must be set to reflect those that "would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. § 114(f)(2)(B). This willing buyer/willing seller standard governs rates and terms for virtually all of the thousands of services making such transmissions. *See id*. § 114(f)(2). Such services are classified as either "eligible nonsubscription transmission" services or "new subscription service[s]," depending on whether they are provided to consumers on a subscription basis. *Id*. § 114(j)(6), (8).

15. The DMCA created an exception, however, for the three "preexisting" subscription services ("PSS") that were in operation prior to the DMCA's passage, and for two "preexisting" satellite digital audio radio services. Those services were grandfathered under the

pre-DMCA statutory license provisions.  17 U.S.C. § 114(d)(2)(B) (applying pre-1998 license conditions to transmissions by a PSS "in the same transmission medium used by such service on July 31, 1998"), (f)(1) (providing rate-setting process for PSS), (j)(11) (defining PSS).  The PSS provided music channels included in cable and satellite television packages prior to July 31, 1998.

16. PSS are not subject to the willing buyer/willing seller standard codified in § 114(f)(2)(B).  Rather, statutory royalties for a PSS are set using the pre-DMCA legal standard, pursuant to statutory objectives set forth in 17 U.S.C. § 801(b)(1).  17 U.S.C. § 114(f)(1).

17. The PSS standard has resulted in royalty rates and payments that have been substantially lower than for new subscription services.  Although some new subscription services provide music over the Internet, others provide music channels to cable and satellite television subscribers in the exact same manner as the PSS.  The PSS, however, currently pay a percentage rate much lower than the percentage rate paid by equivalent new subscription services.  In addition, unlike the PSS, such new subscription services must pay per-subscriber fees if those fees would be greater than the percentage royalty calculation.  *Compare* 37 C.F.R. § 382.3(a) (2015 royalty rate for PSS is 8.5% of revenue) *with* 37 C.F.R. § 383.3(a)(1) (2015 royalty rate for equivalent new subscription services is the greater of 15% of revenue or 1.74¢ per subscriber per month).  In that they pay substantially lower rates than new subscription services, the PSS enjoy a competitive advantage over new subscription services – and, thus, over new competitors.

18. Both PSS and new subscription services are required to provide SoundExchange monthly royalty payments and statements of account for their use of copyrighted sound recordings.  *E.g*., 37 C.F.R. §§ 382.4(a) & 382.13(a) (providing that "[a] Licensee shall make the royalty payments due under" the regulations to SoundExchange); 37 C.F.R. § 383.4(a) (unless

6

otherwise specified, terms governing royalty payments to the Collective in Part 382, Subpart B are incorporated into Part 383).

**B.      Preexisting Subscription Services**

19.     Congress's purpose in grandfathering the PSS under the pre-DMCA statutory license provisions – including the pre-DMCA standard for setting royalty rates – was "to prevent disruption of the existing operations by such services."  H.R. Conf. Rep. No. 105-796, at 80-81 (1998), *reprinted in* 1998 U.S.C.C.A.N. 639, 657.

20.     The Copyright Act defines a "preexisting subscription service" as:

> a service that performs sound recordings by means of noninteractive audio-only subscription digital audio transmissions, which was in existence and was making such transmissions to the public for a fee on or before July 31, 1998, and may include a limited number of sample channels representative of the subscription service that are made available on a nonsubscription basis in order to promote the subscription service.

17 U.S.C. § 114(j)(11).

21.     The statute itself does not further elaborate upon the definition quoted above.  The legislative history of the DMCA, however, states Congress's understanding that only three specific services were entitled to the PSS designation:

> Only three services qualify as a preexisting subscription service — DMX, Music Choice and the DiSH Network.  As of July 31, 1998, DMX and Music Choice made transmissions via both cable and satellite media; the DiSH Network was available only via satellite.

H.R. Conf. Rep. 105-796, at 89.  Elsewhere, the legislative history states:

> There [are] only three such services that exist:  DMX (operated by TCI Music), Music Choice (operated by Digital Cable Radio Associates), and the DiSH Network (operated by Muzak).

*Id.* at 81.  Nowhere in the legislative history does Congress identify either Muzak alone or DirecTV (operated by any entity) as a PSS.

7

22.     The Register of Copyrights (the head of the United States Copyright Office, which is the agency charged with administering and interpreting the Copyright Act) has likewise ruled that only the three entities named in the DMCA's legislative history may qualify for a statutory license at the preferential PSS rate.  When a question arose concerning the ability of Sirius Satellite Radio to rely on the PSS rates for transmissions it made through Dish, the Register relied on the legislative history quoted above to conclude that "in light of Congress's decision to identify specific entities as being preexisting subscription services, it appears Congress meant to limit preexisting subscription service status to the three entities identified by the Board" – namely, "Muzak (provided over the DiSH Network), Music Choice, and DMX." 71 Fed. Reg. at 64,647 (Nov. 3, 2006); *see id.* at 64,646 (explaining that "Congress did use the term 'service' to mean both the program offerings made on a subscription basis to the public *and* the business entity that secures the license . . . ." (emphasis added)).

23.     The Register further explained:

> [T]he purpose of the grandfather provision was to prevent the disruption of *existing* operations which, in this case [concerning the PSS eligibility of Sirius offerings provided over the DiSH Network], was the offering of music channels supplied by Muzak. Muzak was the pioneer music service that incurred both the benefits and risks that came with its investment, and one such benefit was its status as a [PSS] *so long as it provided its music offerings over the DiSH Network*.

*Id*. at 64,646 (emphasis added).

**C.    Muzak, DMX and Mood Media**

Muzak

24.     On information and belief, Muzak and its predecessors have provided music offerings since the 1930s.  Throughout that time, Muzak's core business has been providing music programming to business establishments.  When Muzak transmits its music channels to

8

business establishments (as a "business establishment" service), those transmissions are generally exempt from the sound recording performance right under 17 U.S.C. § 114(d)(1)(C)(iv), although related reproductions are still subject to license requirements. *See* 17 U.S.C. § 112(e)(1).

25. In 1996, Muzak began operating a consumer music offering called DishCD – a set of music channels included as part of subscription packages for the Dish satellite television service (then branded as the DiSH Network). Muzak availed itself of the statutory license to provide these channels. Consistent with the foregoing, Congress in 1998 identified the "DiSH Network (operated by Muzak)" as a PSS entitled to be grandfathered under the pre-DMCA statutory license provisions.

26. Since 1998, Muzak has continued to provide music channels to consumers through Dish. Currently branded as DishCD and Dish Music, Muzak's offerings to Dish subscribers consist of different sets of Muzak channels available with various Dish subscription packages. Muzak makes statutory royalty payments for its transmissions through Dish in reliance on the PSS royalty rate.

27. In 2011, Muzak was purchased by Mood Media Corporation ("Mood"). Muzak now operates as a wholly-owned subsidiary of Mood. In 2013, Mood announced that it was consolidating its services under the Mood brand name.

DMX

28. Since 1986, various entities have provided business and consumer music offerings under the DMX brand name. Since the statutory license's inception, the providers of such offerings have relied upon the statutory license to secure rights to the sound recordings used.

29. Congress originally recognized DMX as a PSS in 1998 (when its consumer service was operated by TCI Music). By 2006, however, the businesses providing DMX-branded offerings had been restructured. In that year, the Register concluded that "the beneficiary of the grandfather provision should be the business entity that was providing the service at the time." 71 Fed. Reg. at 64,646. Providers of DMX offerings subsequently made statutory royalty payments based on the new subscription service rates set under the willing buyer/willing seller standard, rather than the PSS rates.

30. In or around 2010, DMX began providing a new consumer offering branded as SonicTap, which was included in subscription packages for the DirecTV satellite television service. On information and belief, provision of SonicTap through DirecTV subsequently constituted the vast majority of DMX's consumer business.

31. In 2012, Mood acquired DMX Holdings, Inc., which was then the provider of the DMX offerings. Through April 30, 2014, Mood and/or its DMX subsidiaries continued to provide SonicTap through DirecTV, to provide DMX offerings as part of the subscription television packages offered by other MVPDs, and to make royalty payments for these transmissions based on the higher rate that 37 C.F.R. § 383.3 prescribes for new subscription services.

Muzak's Acquisition of the Right to Serve DMX's Customers

32. In July 2014, SoundExchange received an email from Muzak's counsel, stating that "effective May 1, 2014, Muzak acquired the right to provide audio-only channels to all multi-channel video program distributors previously serviced by DMX. This includes DirecTV and its more than 18 million subscribers. Muzak will be serving all of these multi-channel video

program distributors pursuant to its preexisting subscription service license." A true and correct copy of that email (without exhibits) is attached hereto as Exhibit A.

33. SoundExchange asked for clarification about the legal basis for Muzak's claim that the PSS statutory royalty rates are available to it in serving DirecTV and other former DMX customers. On September 26, 2014, Muzak's counsel responded that Muzak is entitled to compete with other services for customers and that "Muzak is eligible to pay royalties as a [PSS] for all of its activities."

**D.     Muzak's Underpayments to SoundExchange**

34. Consistent with the communications from Muzak's counsel, both Mood subsidiaries – DMX and Muzak – made changes in their payments of royalties under the statutory license as of May 1, 2014.

35. For the month of April 2014, DMX submitted a statement of account and royalty payment to SoundExchange based on the rate for new subscription services set forth in 37 C.F.R. § 383.3.

36. Beginning with the month of May 2014, DMX stopped making royalty payments to SoundExchange.

37. On information and belief, the reason why DMX stopped making these royalty payments is that DMX's right to provide audio-only channels to MVPDs including DirecTV was transferred to Muzak.

38. Beginning in May 2014, Muzak reported to SoundExchange monthly PSS revenues that were higher than what it had reported in April 2014.

39. On information and belief, this increase in reported monthly revenues corresponded to payments received by Muzak for the provision of SonicTap through DirecTV,

11

and for the provision of music offerings through other MVPDs previously served by DMX. Since May 2014, Muzak has included such revenues in its calculation of monthly royalty payments pursuant to the PSS rate set forth in 37 C.F.R. § 382.3.

40. Muzak's use of the PSS rate to calculate royalties for SonicTap revenues (and for revenues from other offerings through the MVPDs formerly served by DMX) has resulted in substantial underpayments to SoundExchange.

## COUNT ONE

**(Violation of 37 C.F.R. § 382.13(a), 37 C.F.R. § 383.4, and 17 U.S.C. § 114(f)(2)(B) – Underpayment of Statutory Royalties Based on Improper Use of Preexisting Subscription Services Rate)**

41. SoundExchange incorporates by reference paragraphs 1 to 40 as if fully set forth herein.

42. The Copyright Act provides a statutory license for certain digital performances of sound recordings, as well as related reproductions to facilitate the licensee's performance of sound recordings. 17 U.S.C. §§ 112(e), 114.

43. Because Muzak has chosen to rely on that statutory license, it must make royalty payments to SoundExchange at the rates set by the Copyright Royalty Judges. 17 U.S.C. §§ 112(e)(6)(A), 114(f)(4)(B).

44. Starting with the license period beginning May 1, 2014, Muzak has made digital audio transmissions pursuant to the statutory license through MVPDs other than Dish (including DirecTV), and paid royalties for those transmissions based on the PSS royalty rate, rather than the rate for new subscription services set forth in 37 C.F.R. § 383.3.

45. Muzak's digital audio transmissions through MVPDs other than Dish (including DirecTV) are not subject to PSS rates within the meaning of § 114(j)(11) of the Copyright Act.

Rather, those transmissions are subject to the rates for new subscription services as defined in § 114(j)(8) of the Copyright Act.

46. Muzak's payment based on the PSS royalty rate, rather than the royalty rate for new subscription services, has reduced the amounts that Muzak has paid to SoundExchange under the terms of the federal statutory license.

47. Muzak's underpayments contravene the provisions of the Copyright Act specifying that the rates determined by the Copyright Royalty Judges are "binding on . . . entities performing sound recordings" during the period when the rates are in effect, 17 U.S.C. § 114(f)(2)(B), and that services relying on the statutory license must "pay[] royalty fees in accordance with" § 114(f), *id.* § 114(f)(4)(B)(i). Muzak's underpayments also contravene the requirement that a "Licensee shall make the royalty payments due under" the regulations to SoundExchange, 37 C.F.R. § 382.13(a); *see also* 37 C.F.R. § 383.4.

48. The cumulative amount of Muzak's underpayment – which harms SoundExchange, as well as the performing artists and copyright owners on whose behalf it collects and distributes royalties – continues to grow with each passing month.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, SoundExchange respectfully prays for judgment against Muzak as follows:

a. For compensatory damages (corresponding to Muzak's underpayment of statutory license fees) in such amounts to be determined at trial;

      b.      For a declaration that Muzak is not entitled to make statutory royalty payments based on the PSS rates for digital audio transmissions it makes through MVPDs other than Dish (including DirecTV);

      c.      For appropriate late fees and interest;

      d.      For SoundExchange's costs, including reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505; and

      e.      For any other relief the Court deems just and proper.

Dated: April 1, 2015

Respectfully submitted,

/s/ Michael B. DeSanctis
Michael B. DeSanctis (D.C. Bar # 460961)
Steven R. Englund (D.C. Bar # 425613)
Joshua M. Segal (D.C. Bar # 975949)
Emily L. Chapuis (D.C. Bar # 1017600)
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Plaintiff SoundExchange, Inc.*