UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUNDEXCHANGE, INC. ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case 15-cv-0476-RCL |
| ) | |
| MUZAK, LLC ) | |
| ) | |
| Defendant ) | |

## MEMORANDUM OPINION

Now before the Court is defendant's motion to dismiss, plaintiff's opposition, and defendant's reply. ECF Nos. 13, 18, & 21. For the reasons stated below and by separate order issued this date, defendant's motion shall be GRANTED.

### I. BACKGROUND

The facts set out herein are either undisputed, or are as alleged by plaintiff. The Court, in keeping with its responsibilities under Federal Rules of Civil Procedure 12(b)(6) accepts as true all factual allegations set forth by plaintiff for purposes of this motion.

#### a. Plaintiff's role in collecting royalties under the Copyright Act

Plaintiff is a nonprofit organization, with statutory authority under, *inter alia*, 17 U.S.C. § 114(g) and 37 C.F.R. §§ 370, 382, and 384, as designated by the Copyright Royalty Judges. Compl., ECF No. 1, at 3; 17 U.S.C. § 801. Plaintiff filed the complaint in this case as the "sole entity designated by regulation" to "collect statutory license payments from copyright users and to distribute those payments to performing artists and copyright owners." Compl. 2. Section 114 contains various provisions making plaintiff, as the designated nonprofit agent, responsible for

administrating and distributing statutory royalties and enforcing statutory licenses. The Copyright Act provides these statutory licenses as "an alternative to having every music service negotiate separate licenses with every copyright owner," under § 112(e) and (d)(2). Compl. 4. Those companies which make use of such statutory licenses pay royalties at rates set by Copyright Royalty Judge under §§ 112(e)(3) and 114(f). Accordingly, defendant (as well as other entities utilizing statutory licenses) are obligated to make payments to plaintiff under the aforementioned statutory licenses. Compl. 2.

### b. The Digital Millennium Copyright Act

The Digital Millennium Copyright Act ("DMCA") established a new statutory scheme to determine royalties under Title 17 of the United States Code. Pub. L. No. 105-304, 112 Stat. 2860 (Oct. 28, 1998); 17 U.S.C. §§ 101, *et seq.*; Compl. 1; Def.'s Mot. Dismiss 9-11. The new standard for calculating royalty rates under the DMCA should reflect what "would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. § 114(f)(2)(B). This is referred to as the willing buyer/willing seller standard. While the DMCA established new standards for determining royalty rates, it also created an exception for preexisting subscription services ("PSS" or "PES"). 17 U.S.C. § 114(j)(11). Defendant and two other entities were grandfathered under this exception. Compl. 6. PSS are not subject to the "willing buyer/willing seller" standard, but instead enjoy generally favorable royalty rates. Compl. 5-6. The lower PSS rates give the PSS a competitive advantage over non-PSS. Compl. 6; Pl.'s Opp. Def.'s Mot. Dismiss 11.

### c. Muzak

Defendant is the provider of "a subscription-based digital music service for various satellite and cable television providers." Def.'s Mot. Dismiss 6. Defendant provided digital music service available to consumers as music channels transmitted with Dish satellite television service ("Dish") packages under the name DishCD. Compl. 1 & 9. DishCD consists generally of audio-only content transmitted on certain channels of Dish Network ("Dish"), a multichannel video programming distributor ("MVPD") under 47 U.S.C. § 522(13). Compl. 1-2. As such, defendant was one of the first entities to utilize the statutory licensing scheme provided under § 114(d)(2). Compl. 1. In 1998, under the DMCA, Congress revised the statutory licensing provisions, granting several entities status as PSS. Pub. L. No. 105-304, 112 Stat. 2860 (Oct. 28, 1998). Defendant was specifically identified as a PSS in the legislative history of the DMCA, and has continued to operate as such within the statutory definition of PSS. 17 U.S.C. § 114(j)(11); H.R. Conf. Rep. 105-796, 105th Cong., 2nd Sess., 657 (1998).

### d. DMX

DMX, as "DMX (operated by TCI Music)" was also originally designated as a PSS in 1998. 17 U.S.C. § 114(j)(11); H.R. Conf. Rep. 105-796, 105th Cong., 2nd Sess., 657 (1998); Compl. 10. By 2006, DMX business and offerings had been restructured and the resultant entity no longer claimed the PSS rates. Compl. 10; *Designation as a Preexisting Subscription Service*, 71 Fed. Reg. 64,639-1 (Nov. 3, 2006). After 2006, DMX, or the entities offering music services under the DMX brand name, made statutory royalty payments to plaintiff under the new subscription service rate. Compl. 10. DMX began offering a new brand, SonicTap, in 2010, which provided subscription packages for DirecTV satellite television at the new subscription

service rates (the willing buyer/willing seller standard) rather than the PSS rates. 17 U.S.C. § 114(f)(2)(B); Compl. 10; Pl.'s Opp. Def.'s Mot. Dismiss 13-14.

### e. Acquisition of Muzak and DMX

Mood Media Corporation ("Mood") acquired Muzak in 2011. Compl. 9. In 2012, Mood also acquired DMX Holdings, Inc., which was the provider of DMX services (specifically, SonicTap on DirecTV). Compl. 10. When Mood acquired DMX, SonicTap was making royalty payments at the new subscription service rate. Compl. 10. Defendant acquired the right to provide audio-only channels to DMX's previous customers effective May 1, 2014. Compl. 10; Pl.'s Opp. Def.'s Mot. Dimiss 14. Defendant notified plaintiff of the acquisition and intent to utilize the PSS rate, then continued to make royalty payments for the services that were previously provided by DMX, specifically the SonicTap services, at the PSS rate. Compl. 10-11. Plaintiff asked defendant for clarification as to why defendant believed that these services qualified for the PSS royalty rates, to which defendant replied it was "eligible to pay royalties as a [PSS] for all of its activities..." Compl. 11. In May 2014, DMX ceased independently making royalty payments to plaintiff; at the same time defendant began making royalty payments at a higher rate. Compl. 11. Presumably, the higher payment reflects defendant making royalty payments for providing the services it began making that were previously made by DMX.

## II. ANALYSIS

The parties dispute whether defendant is entitled to utilize the PSS royalty rate for certain services it provides to customers previously served by DMX Holdings, Inc.'s SonicTap. The parties do not appear to dispute the material fact recited herein. Instead, the issue appears to be one of statutory interpretation.

### a. Jurisdiction and Venue

Jurisdiction is appropriate under the Copyright Act and Title 28 of the U.S. Code. 17 U.S.C. § 101, *et seq.*; 28 U.S.C. § 1331; 28 U.S.C. § 1338(a). The Court accepts, for the purposes of this motion, plaintiff's undisputed factual allegations that venue is proper due to defendant's sufficient contacts with the district, as well as the allegation that a substantial part of the events giving rise to the dispute occurred within the district. Compl. 2; 28 U.S.C. § 1391(b)(1) & (b)(2).

### b. Standard of Review– Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)

Defendant moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). In order to withstand a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 555 (2007) (internal quotations marks and citations omitted). Further, in ruling on a motion to dismiss, the D.C. Circuit notes that the court will generally, "accept as true all of the factual allegations contained in the complaint." *Atherton v. Dist. of Columbia*, 567 F.3d 672, 681 (D.C. Cir. 2009). This does not mean that the court must accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### c. DMCA, § 114(j)(11)

The parties disagree on whether defendant can continue to utilize the PSS royalty rate with regard to the portion of services transferred from DMX (primarily SonicTap). Compl. 9-11; Def.'s Mot. Dismiss 10.

The DMCA provides the following definition of PSS:

> A "preexisting subscription service" is a service that performs sound recordings by means of noninteractive audio-only subscription digital audio transmissions, which was in existence and was making such transmissions to the public for a fee on or before July 31, 1998, and may include a limited number of sample channels representative of the subscription service that are made available on a nonsubscription basis in order to promote the subscription service.

17 U.S.C. § 114(j)(11) (2015). There are two relevant clauses in § 114(j)(11). First, "a service that performs sounds recordings by means of noninteractive audio-only subscription digital audio transmissions." The next clause that is relevant is the language, "which was in existence and was making such transmissions to the public for a fee on or before July 31, 1998." § 114(j)(11).

### d. Statutory Interpretation

The parties differ in their interpretation of how § 114(j)(11) applies the grandfathering provision. Defendant contends that the plain text of the statute yields a two-part analysis to determine whether status as a PSS is granted under the DMCA; first, that the service provides sound recordings by "noninteractive audio-only" means, and second, that it has been providing "such transmissions" since July 31, 1998. Def.'s Mot. Dismiss 16 (citing § 114(j)(11)). Defendant argues that this is a disjunctive test and therefore that it can meet each criteria separately to qualify for PSS rates. Def.'s Mot. Dismiss at 11-12. Defendant argues that a plain reading of the statute reveals that the language "such transmissions" means the type of transmissions laid out in the beginning

of that sentence, or "noninteractive audio-only subscription digital audio transmissions," regardless of whether provided to the same customers, or a different group of customers. Def.'s Reply Pl.'s Opp. Def.'s Mot. Dismiss 6-8 (citing 17 U.S.C. § 114(j)(11) (2015)).

Conversely, plaintiff comprehends § 114(j)(11) to impose a conjunctive two-part requirement. Pl.'s Opp. Def.'s Mot. Dismiss, 7-8. Specifically, plaintiff alleges that the PSS royalty only applies to PSS at the time of the DMCA's enactment and only for their services provided at that same time that qualified for the PSS royalty rate. *Id.* In other words, "[t]o benefit from PSS rates . . . a licensee had to be the same business entity that secured the statutory license prior to July 31, 1998. . . ." Pl.'s Opp. Def.'s Mot. Dismiss 12. When it comes to "such transmissions," plaintiff interprets this phrase as requiring the PSS to be making exactly the same transmissions as it was on July 31, 1998. Pl.'s Opp. Def.'s Mot Dismiss 17. Put another way, plaintiff is interpreting the word "such" to mean "the same" or "identical" transmissions to the same set of customers. *Id.*

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). The *Robinson* court noted that "[o]ur inquiry must cease if the statutory language is unambiguous . . . ." *Id.* The difference between the parties comes down to whether the entity which qualified as a PSS can make the same type of transmissions contemplated by § 114(j)(11) to new customers and retain the PSS royalty rate for the additional transmissions. To determine whether Congress intended for the PSS rate to apply in this manner, the Court examines the rest of the statute.

7

There are other provisions in the statute that make clear Congress's intent for PSS to be able to expand their businesses in certain ways yet remain under the PSS royalty scheme. In § 114(f)(1)(C), the statute provides that a copyright owner or PSS can initiate procedures under § 114(f)(1)(A) or (B) "indicating that a new type of subscription digital audio transmission service on which sound recordings are performed is or is about to become operational . . ." in order to determine whether such service should fall under the PSS royalty rates as established by the Copyright Royalty Judges pursuant to § 114(f)(1)(A) or (B). Subsection 114(f)(1) thus provides a mechanism for the PSS to notify the appropriate authority that there is a new type of service and essentially obtain a ruling about whether transmissions on this new type of service may also fall under the PSS rate. This provision, therefore, is clear evidence that Congress did at least intend for a PSS to be able to provide the some "new type" of service and still utilize the PSS royalty rate.

### e. Legislative History and the 2006 Decision

Though the Court need rely on the legislative history of § 114, nor look to the Register of Copyrights' 2006 decision, it sees its ruling today as consistent with the Register's analysis as well as § 114's legislative history. H.R. Conf. Rep. 105-796, 105th Cong., 2nd Sess. (1998); U.S. Copyright Office, *Designation as a Preexisting Subscription Service*, 71 Fed. Reg. 64,639-1 (Nov. 3, 2006). To wit, the conference report describes a PSS as "making transmissions to the public on or before July 31, 1998, and which is making transmissions *similar in character* to such transmissions made on or before July 31, 1998." H.R. Conf. Rep. 105-796 at 89 (1998) (emphasis added). Next, the report notes:

> . . . the conferee's objective was to limit the grandfather to their existing services in the same transmission medium and to any new services in a new transmission medium where only transmissions similar to their existing service are provided. Thus, if a cable subscription music service making transmissions on July 31, 1998, were to offer the same music service through the Internet, then such Internet service would be considered part of a preexisting subscription service.

*Id.* The operative language here is "to any new services in a new transmission medium where only transmissions similar to their existing service are provided." *Id.* Immediately following that, the report provides:

> If, however, a subscription service making transmissions on July 31, 1998, were to offer a new service either in the same or new transmission medium by taking advantages of the capabilities of that medium, such new service would not qualify as a preexisting subscription service. For example, a service that offers video programming, such as advertising or other content, would not qualify as a preexisting service, provided that the video programming is not merely information about the service itself, the sound recordings being transmitted, the featured artists, composers or songwriters, or an advertisement to purchase the sound recording transmitted.

*Id.* The operative language in this portion of the report appears to be "new service either in the same or new transmission medium by taking advantages of the capabilities of that medium. . . ." *Id.*

Likewise, in 2006, the Register of Copyrights reached a decision in which it concluded the term "preexisting subscription service" is best understood as "referring to the business entity identified as the [PSS]," rather than the program offerings made on a subscription basis to the public. 71 Fed. Reg. at 64646. Although the Register's decision also relies upon principles of statutory construction not indulged here, the Register's principle reasoning remains in accordance with this opinion.

9

III.    CONCLUSION

In light of the Court's analysis defendant's motion shall be GRANTED by a separate Order issued this date.

Signed by Royce C. Lamberth, United States District Judge, March 7, 2016.